United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JANE DOE,

              Plaintiff,

     v.

SAMUEL MERRITT UNIVERSITY,

              Defendant.

Case No.: C-13-00007 JSC

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION OR TEMPORARY RESTRAINING ORDER**

20

21

22

23

24

25

     This action involves Defendant Samuel Merritt University's alleged failure to provide a disabled student with additional opportunities to take a medical licensing exam. Now pending before the Court is Plaintiff's Motion for Preliminary Injunction or Temporary Restraining Order ("Motion"). (Dkt. No. 11.) After carefully considering the evidence properly submitted by the parties, and having the benefit of oral argument on January 29, 2013, the Court GRANTS in part and DENIES in part Plaintiff's Motion.

26

**BACKGROUND**

27

28

     Plaintiff was a student enrolled in Samuel Merritt University's ("SMU") California School of Podiatric Medicine ("CSPM") from 2009 to 2012, pursuing a Doctor in Podiatric Medicine degree.

On April 5, 2011, George Vroulis, Ph.D diagnosed Plaintiff with Generalized Anxiety Disorder (DSM-IV-TR 300.02) and Panic Disorder with Agoraphobia (DSM-IV-TR 300.21).  In July 2011, at the close of her second year of study, Plaintiff received testing accommodations for her tests at SMU—namely, time-and-a-half and a separate room in which to complete the exams.  (*See* Dkt. No. 8, Ex. 4, Declaration of Jane Doe ("Doe Decl.") ¶ 10.)  Plaintiff represents that this improved her grade point average ("GPA") from 1.8 to 3.2.  (*See id.* at ¶ 11; *but see* Dkt. No. 12, Declaration of Dr. John N. Venson ("Venson Decl.") ("Upon her dismissal from CSPM, she had a cumulative [GPA] of 2.626.").)

To continue on to the third-year clinical rotations, Defendant requires that all students, including Plaintiff, pass Part I of the American Podiatric Medical Licensing Examinations ("APMLE"), which is devised and administered by a third-party.  Since the 2008-09 school year, Defendant further requires that all students, including Plaintiff, pass Part I within three attempts of taking the exam.  If a student does not pass the exam in the first three attempts, the student is dismissed from SMU.  The parties refer to this requirement as the "three strikes" rule.

On August 8, 2012, Plaintiff was dismissed from SMU for failing to pass Part I on her third attempt.  Plaintiff challenged her dismissal through Defendant's grievance procedures, and on September 27, 2012, a grievance hearing was held.  In addition to requesting that she be reinstated to the school, she asked for an accommodation: that no restriction be placed on the number of times she may take Part I.  Plaintiff contends that the "make or break" nature of the exam "exacerbates [her] anxiety so much that [she] cannot perform."  (Dkt. No. 8, Doe Decl. ¶ 13.)  Defendant denied her grievance in full.

While her grievance was pending, however, Plaintiff took Part I for a fourth time, but did not pass.  Now that Plaintiff has lost her grievance, Defendant refuses to give Plaintiff the proper authorization needed to allow her to sit for the exam.  Plaintiff must be at least inactively enrolled in SMU in order to sit for the exam.[1]  The next opportunity for Plaintiff to take the exam is in July 2013.

---

[1] At oral argument the Court asked the parties whether in fact Plaintiff must be enrolled in a podiatry school to take the exam since she has completed all of the prerequisite course requirements. At the hearing the parties were of the belief that the Part I administrator requires such enrollment.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    On December 20, 2012, Plaintiff filed suit against Defendant in Alameda County Superior

2 Court, alleging ten causes of action: 1) violation of the Americans with Disabilities Act ("ADA"), 42

3 U.S.C. § 1201 *et seq.*; 2) violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*;

4 3) violation of California Government Code § 11135; 4) violation of the Unruh Civil Rights Act,

5 California Civil Code § 51 *et seq.*; 5) breach of contract; 6) promissory estoppel; 7) intentional

6 infliction of emotional distress; 8) negligent infliction of emotional distress; 9) preliminary

7 injunction; 10) declaratory relief.  Defendant removed the case to federal court on January 2, 2013.

8 Plaintiff subsequently filed the pending motion for preliminary injunctive relief.

9                                          **LEGAL STANDARD**

10    A preliminary injunction is an "extraordinary remedy."  *Winter v. Nat. Res. Defense Council*,

11 555 U.S. 7, 24 (2008).   "A plaintiff seeking a preliminary injunction must establish that he is likely

12 to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary

13 relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."

14 *Id.* at 20.  Alternatively, "'serious questions going to the merits' and a balance of hardships that tips

15 sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff

16 also shows that there is a likelihood of irreparable injury and that the injunction is in the public

17 interest."  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (holding

18 that the "serious questions" test survives the Supreme Court's decision in *Winter*).  A "serious

19 question" is one on which the movant "has a fair chance of success on the merits."  *Sierra On–Line,*

20 *Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984).

21    Defendant argues that Plaintiff's Motion requests a mandatory injunction and it should

22 therefore be held to the higher standard that applies to such injunctions.  A prohibitory injunction

23 maintains the status quo whereas a mandatory injunction "goes well beyond simply maintaining the

24 status quo *pendente lite* [and] is particularly disfavored."  *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313,

25 1320 (9th Cir. 1994) (internal quotation marks omitted).  The status quo means "the last, uncontested

26

27 Following oral argument, Defendant asked for additional time to supplement the record with a
response to the Court's question.  Defendant's request is denied.  Defendant can move to vacate the
28 preliminary injunction if it determines that Plaintiff does not need to be enrolled to obtain the
injunctive relief she seeks; namely, to take the Part I exam. [move to later]

                                             3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

status which preceded the pending controversy." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009).  The last uncontested status which preceded the controversy was Plaintiff's enrolled student status.  Therefore, Plaintiff's requested injunctions would, at the most, maintain the status quo of her status as an enrolled student and is a prohibitory injunction—not a mandatory injunction.

**DISCUSSION**

**A.      Likelihood of Irreparable Harm**

Plaintiff seeks a preliminary injunction from this Court that will (1) "grant Plaintiff active status and enable her to immediately begin attending her remaining clinical rotations, the next of which begins on February 4, 2013 while allowing her to continue to take the APMLE, without restrictions," or, alternatively, (2) "grant Plaintiff inactive student status so she may continue to take the APMLE during the pendency of the case and, once she passes, allow her to attend remaining clinical rotations." (Dkt. No. 11 at 4.)  Plaintiff asserts that the failure to provide either injunction will likely result in irreparable harm.

As an initial matter, Plaintiff contends that she does not need to show irreparable harm where the offending party engages in acts or practices prohibited by a federal statute that provides for injunctive relief.  Defendant disagrees, citing cases out of the Seventh Circuit that hold that a showing of irreparable harm is required even for suits brought under such statutes.  While it appears the Ninth Circuit has yet to directly address this question, a court in this District has noted that a presumption of irreparable harm conflicts with the Supreme Court's decision in *Winter*.  *See Enyart v. Nat'l Conference of Bar Exam'rs, Inc.*, 2010 WL 475361 * 6 (N.D. Cal. Feb. 4, 2010) ("To the extent prior Ninth Circuit case law concluded that irreparable harm need not be shown in certain statutory contexts, that case law is in conflict with *Winter*."); *see also Winter*, 129 U.S. at 22 (rejecting a "possibility" standard for irreparable injury where a plaintiff demonstrates a strong likelihood of prevailing on the merits).[2]  This Court agrees.

_____

[2]  Although Plaintiff cites to *Antoninetti v. Chipotle Mexican Grill, Inc.*, 643 F.3d 1165, 1175 (9th Cir. 2010), as holding that "the standard requirements for equitable relief need not be satisfied when an injunction is sought to prevent the violation of a federal statute which specifically provides for injunctive relief," that citation is not dispositive of the issue.  The court in *Antoninetti* repeated this holding, quoted from *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827

4

1    If the Court declines to issue Plaintiff's first requested injunction—return to active student

2    status even before she passes Part I—Plaintiff claims she will be irreparably harmed because she will

3    miss the Spring 2013 clinical rotations, which begin on February 4.  She states that she has already

4    missed the 2012 Summer and Fall semesters because of Defendant's violations.  Further, Plaintiff

5    contends that she needs to begin her third-year clinics on February 4 "because she has completed a

6    significant amount of her schooling and if she is interrupted now, she will lose significant ground."

7    (Dkt. No. 11 at 13; *see* Dkt. No. 8, Ex. 4, Doe Decl. ¶ 12 ("A break in the program makes it much

8    harder for me to succeed and therefore makes me anxious."), ¶ 21 ("The passage of time is eroding

9    the knowledge base and confidence I feel are needed to complete the program.").)  These statements

10   appear to apply equally to Plaintiff's alternative requested injunction—inactive student status and the

11   ability to retake Part I until she passes.  Plaintiff also notes that absent an issuance of either

12   injunction, she will not be able to earn her degree from SMU during the pendency of the litigation,

13   thus precluding her from advancing her professional career.  Plaintiff's showing is sufficient to

14   warrant a finding of likelihood of irreparable harm in the absence of issuing either injunction.  *See*

15   *Enyart*, 2010 WL 475361 *7 (finding that plaintiff seeking preliminary injunction requiring

16   defendant to provide plaintiff's requested accommodation while taking the MBE and MPRE showed

17   likelihood of irreparable harm where plaintiff claimed "that in the absence of a preliminary

18   injunction, the time she spent in preparation will have been wasted, she will suffer a serious career

19   setback, [and] will face the prospect of preparing once again at a separate time), *aff'd*, 630 F.3d

20   1153, 1166 (9th Cir. 2011) ("[T]he district court did not err in concluding that Enyart would likely

21   lose the chance to pursue her chosen profession.  If she fails the Bar Exam or scores too low on the

22   MPRE to qualify for admission, Enyart cannot be licensed to practice law in California.").

23   In addition, the Court rejects Defendant's argument that Plaintiff cannot show a likelihood of

24   irreparable harm since Plaintiff could theoretically transfer to another school that does not have

25   Defendant's same requirements.  Defendant cites *Baer v. Nat'l Bd. of Med. Exam'rs*, 392 F. Supp.

26   2d 42, 49 (D. Mass. 2005) in support; however, the court there held that a disruption in the plaintiff's

27   (9th Cir. 2001), in declining to address whether a district court may have discretion under the ADA

28   to deny injunctive relief after finding a violation of the Act.  The court's brief mention of the holding
     did not include a reference to *Winter*.

*United States District Court*
*Northern District of California*

5

1    medical career was not an irreparable harm because "*[t]he record indicates* that she may plausibly

2    seek admission to other medical schools that, unlike Drexel, do not condition matriculation on

3    passing the Step 1 exam." (emphasis added). Here, while Plaintiff herself informs the Court that

4    other similar schools do not have Defendant's same testing requirements, the record does *not*

5    indicate that Plaintiff may plausibly transfer to another podiatry school.

6    **B.    Likelihood of Success on the Merits / Serious Questions going to the Merits**

7        Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis

8    of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages,

9    or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a). To succeed on

10   her ADA claim, Doe would need to prove that (1) she is disabled, (2) SMU is a private entity which

11   owns, leases or operates a place of public accommodation, and (3) SMU failed to make reasonable

12   modifications in its policies, practices, or procedures to accommodate her alleged disability without

13   fundamentally altering the nature of the public accommodation.[3] *See* 42 U.S.C. § 12182(a) & (b).[4]

14   Only the first and third requirements are in dispute.

15

16

17        [3] Defendant states that an additional requirement, at least in the higher education context, is
     that Plaintiff must show she is "otherwise qualified" academically; that is, Plaintiff must be able to
18   meet SMU's educational requirements with a reasonable accommodation. However, "Title III of the
     Act regarding public accommodations applies not to 'qualified individuals,' but simply to any
19   'individual.'" *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1112 (9th Cir. 2000).
20   Additionally, Defendant cites to no case in the Ninth Circuit applying this standard outside of the
     Title II context, which *does* apply only to "qualified individuals." *See* 42 U.S.C. § 12132.
21   Nonetheless, the Court agrees with the Sixth Circuit, which stated that "the 'otherwise qualified'
     idea is implicit in Title III's acknowledgment, noted above, that requested modifications need not be
22   provided if they will fundamentally alter the nature of the program. It is beyond question that it
     would fundamentally alter the nature of a graduate program to require the admission of a disabled
23   student who cannot, with reasonable accommodations, otherwise meet the academic standards of the
24   program." *Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1076 (6th Cir. 2006). Thus, to the extent that
     Plaintiff is unable to meet SMU's academic requirements even with reasonable accommodations,
25   that determination will be factored into the third requirement for Plaintiff's ADA claim.
26        [4] Although Plaintiff acknowledges that her claim under the Rehabilitation Act requires a
     showing of being "otherwise qualified," her Motion does not distinguish her ADA claim from her
27   Rehabilitation Act claim, or her Unruh Act claim for that matter. Because neither party contests that
28   the Motion turns on which statute is at issue, the Court confines its analysis, as the parties do, to
     Plaintiff's ADA claim.

United States District Court
Northern District of California

6

1       Separately, Defendant argues that Plaintiff is unlikely to succeed on the merits because her

2  claims are barred by Plaintiff's failure to receive an administrative writ of mandamus as required by

3  California Code of Civil Procedure § 1094.5.

4       **1.       Disability**

5       Under the ADA, the term "disability" means, with respect to an individual, "(A) a physical or

6  mental impairment that substantially limits one or more major life activities of such individual;[5] (B)

7  a record of such an impairment; or (C) being regarded as having such an impairment" as described in

8  42 U.S.C. § 12102(3).  42 U.S.C. § 12102(1).

9       Much of the parties' discussion of Plaintiff's alleged disability fails to take into account the

10  ADA Amendments Act of 2008 ("ADAAA"), Pub. L. 110–325, 122 Stat. 3553, which became

11  effective on January 1, 2009.  This omission is significant considering that the "ADAAA seeks to

12  broaden the scope of disabilities covered by the ADA after that scope had been narrowed by

13  Supreme Court interpretation." *Karr v. Napolitano*, 2012 WL 4462919 *8 (N.D. Cal. Sept. 25,

14  2012); *see* Pub. L. 110–325, 122 Stat. 3553 (finding that Supreme Court precedent, e.g., *Toyota*

15  *Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), and Equal Employment Opportunity

16  Commission ADA regulations narrowed the definition of disability inconsistent with congressional

17  intent).  Because the alleged discrimination occurred after January 1, 2009, the ADAAA applies

18  here.

19       Congress stated that a purpose of the amendments was to reject "that the terms 'substantially'

20  and 'major' in the definition of disability under the ADA 'need to be interpreted strictly to create a

21  demanding standard for qualifying as disabled,' and that to be substantially limited in performing a

22  major life activity under the ADA 'an individual must have an impairment that prevents or severely

23  restricts the individual from doing activities that are of central importance to most people's daily

24  lives.'" Pub. L. 110–325, 122 Stat. 3553, § 2(b)(4).  42 U.S.C. § 12102(4), added to the statute by

25  the ADAAA, provides, among other things, that "[t]he term 'substantially limits' shall be interpreted

26

27       [5] "[M]ajor life activities include, but are not limited to, caring for oneself, performing
manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking,
28  breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. §
12102(2)(A).

United States District Court
Northern District of California

7

United States District Court
Northern District of California

1    consistently with the findings and purposes of" the ADAAA.  EEOC regulations, in turn, provide

2    guidance for interpreting the term "substantially limits."  *See* 42 U.S.C. § 12205a ("Rule of

3    construction regarding regulatory authority").  According to the regulations, the term substantially

4    limits "is not meant to [impose] a demanding standard" and determining "whether an impairment

5    'substantially limits' a major life activity should not demand extensive analysis."  29 C.F.R. §

6    1630.2(j)(1)(i), (iii).  The regulations further provide that the "term 'substantially limits' shall be

7    construed broadly in favor of expansive coverage."  *Id.* § 1630.2(j)(1)(i).  Regarding "major life

8    activities," the regulations provide that in determining other examples of such activities outside of

9    those delineated in the statutes, "the term 'major' shall not be interpreted strictly to create a

10   demanding standard for disability.  Whether an activity is a 'major life activity' is not determined by

11   reference to whether it is of 'central importance to daily life.'"  *Id.* § 1630.2(i)(2) (internal citations

12   omitted).

13           While Defendant does not dispute that Plaintiff's ADD diagnosis constitutes an impairment,

14   Defendant asserts that Plaintiff's impairment does not substantially limit a major life activity.

15   Plaintiff identifies three major life activities implicated by her diagnosis: test-taking, learning, and

16   working.

17                   a.      **Test-taking**

18           The parties disagree as to whether test-taking activity is a "major life activity."  Plaintiff

19   correctly notes that at least one court has found that test-taking is a major life activity.  *See Bartlett*

20   *v. N.Y. State Bd. of Law Examiners*, 970 F. Supp. 1094, 1117 (S.D.N.Y. 1997), *aff'd in part and*

21   *vacated in part on other grounds*, 156 F.3d 321 (2d Cir. 1998), *vacated on other grounds*, 527 U.S.

22   1031 (1999).  Then-Judge Sotomayor found that test-taking met the EEOC's definition of "major life

23   activities," which at the time was defined as "those basic activities that the average person in the

24   general population can perform with little or no difficulty."  *Id.* (quoting 29 C.F.R. Pt. 1630, App. §

25   1630.2(i) (1991)) (internal quotation marks omitted).  She reasoned that while test-taking "could

26   arguably not be 'basic[,]' . . . in the modern era, where test-taking begins in the first grade, and

27   standardized tests are a regular and often life-altering occurrence thereafter, both in school and at

28   work, I find test-taking is within the ambit of 'major life activity.'"  *Id.*  Since 1997, the central role

1   of test-taking in our society has only increased.  For example, California now requires that all public

2   school students pass the California High School Exit Exam ("CAHSEE") in order to receive a high

3   school diploma.  *See* Cal. Educ. Code § 60851; *see also O'Connell v. Superior Court*, 141 Cal. App.

4   4th 1452, 1457-59 (2006) (explaining that while passed by the California Legislature in 1999, the

5   CAHSEE diploma requirement was not imposed on students prior to 2006).  That the passing of a

6   standardized test is now required in California to receive something as fundamental as a high school

7   degree cuts strongly against Defendant's contention that "it is beyond dispute that test taking is not a

8   major life activity."  (Dkt. No. 12 at 17.)

9           Defendant, however, rejects *Bartlett*, arguing that it is an outlier among the caselaw.

10  Defendant contends that *Bartlett* is inconsistent with subsequent Supreme Court instruction on

11  determining whether a life activity is "major," citing to *Toyota Motor*, 534 U.S. 184.  However, as

12  noted above, the ADAAA explicitly overruled the Supreme Court on its strict interpretation of the

13  disability definition.  In addition, the cases that have explicitly found that test-taking is not a major

14  life activity have all done so prior to the ADAAA and, further, relied on the now-overruled strict

15  interpretation of that term in reaching their decisions.  *See Singh v. George Washington Univ. Sch. of*

16  *Med. & Health Scis.*, 508 F.3d 1097, 1104 (D.C. Cir. 2007);  *Baer v. Nat'l Bd. of Med. Exam'rs*, 392

17  F. Supp. 2d 42 (D. Mass. 2005) (citing *Toyota Motor* for the proposition that "[t]he ADA 'create[s] a

18  demanding standard for qualifying as disabled,' requiring that the terms 'substantially limits' and

19  'major life activity' 'be interpreted strictly'"); *Jenkins v. Nat'l Bd. of Med. Exam'rs*, 2008 WL

20  410237 *2 (W.D. Ky. Feb. 12, 2008) ("Courts that have applied this standard to similar facts in the

21  wake of *Toyota*'s unanimous decision have determined that test-taking is not a 'major life activity,'

22  and have emphasized the narrow definition of a 'disability' imposed by the terms of the ADA and

23  *Toyota*.").

24          Given the state of the caselaw, the recent directives of Congress, and the importance of test-

25  taking in our society, the Court finds that Plaintiff has, at a minimum, raised "serious questions" as

26  to whether test-taking is a major life activity under the ADA.  In addition, Defendant does not

27  dispute that Plaintiff's limitation "substantially limits" her ability to take tests.

28

United States District Court
Northern District of California

9

1    Finally, Defendant argues that even if test-taking is a major life activity, Plaintiff actually

2    alleges that taking the particular Part I test—and not tests in general—is the basis for her disability

3    claim.  Defendant contends that not even *Bartlett* supports finding that a particular test can constitute

4    a major life activity.  While Plaintiff does make much of the so-called "make or break" nature of

5    Part I, it is undisputed that Plaintiff receives the same accommodations for that test as she has

6    received for all her other tests at SMU since requesting accommodation, whether "make or break" or

7    not.  The Court finds that it is better to understand Plaintiff's distinction of the Part I test as a request

8    for a different *accommodation*—namely, the ability to take the test as many times as she'd like—that

9    is needed for that test but no other test.  Accordingly, although Plaintiff may need different

10   accommodations for certain tests, Plaintiff's limitation affects her ability to takes tests in general.

11                              **b.      Learning**

12   Plaintiff also argues that her limitation substantially limits her ability to learn, which is

13   indisputably a "major life activity."  Defendant, however, correctly observes that Plaintiff does not

14   allege that her ADD impairs her ability to learn generally; rather, Plaintiff restricts her disability,

15   stating that it "affects my ability to demonstrate my knowledge in the time constraints allowed on

16   traditionally timed tests."  (Dkt. No. 8, Ex. 4, Declaration of Jane Doe ¶ 17.)  Thus, "learning" is

17   simply "test-taking" under a different name.  To the extent Plaintiff contends that her limitation

18   substantially limits her ability to learn beyond the realm of test-taking, Plaintiff has failed to put

19   forward sufficient supporting evidence.  While Dr. Vroulis states that Plaintiff's "condition

20   substantially limits her ability to learn and to perform in testing conditions," (Dkt. No. 11, Ex. 2,

21   Declaration of Dr. Vroulis ¶ 3), there is nothing beyond this conclusory remark to support the

22   proposition that Plaintiff's limitation affects her ability to learn outside of testing situations.

23                              **c.      Working**

24   Plaintiff's assertion that her limitation substantially limits her ability to work is similarly

25   misguided.  Again, Plaintiff's evidence on this motion only shows that her limitation affects her

26   ability to take tests.  Plaintiff, however, stretches this fact, contending that because she is limited in

27   taking tests that are required in order to work as a podiatrist, she is therefore also limited in actually

28   working as a podiatrist.  The Court doubts that even under the liberal standards of the ADAAA such

United States District Court
Northern District of California

10

1    an attenuated inference may form the basis of a disability finding.  Indeed, Plaintiff argues that she is

2    *not* limited at all in her ability to work as podiatrist; her limitation simply affects her ability to take

3    the tests that are required to practice podiatry.  Accordingly, the Court finds that Plaintiff has not

4    produced evidence that raises a "serious question" as to her ability to work.[6]

### 2. Reasonable Modifications

6    Defendant contends that Plaintiff cannot succeed on her claims based on a failure to

7    accommodate because Plaintiff's requested accommodation—unlimited opportunities to take Part

8    I—would fundamentally alter its academic program.  Defendant asserts that permitting unlimited

9    tries on the exam would require it to fundamentally lower its standards, which since the 2008-09

10   academic year, have required that its students pass the exam within three attempts.  Further,

11   Defendant argues that it would devalue those candidates who meet the advancement requirements.

12   Defendant concludes that this Court must defer to its professional academic judgment when

13   evaluating the reasonable accommodation requirement.

14   In the realm of the ADA and Rehabilitation Act, the Ninth Circuit has held "that an

15   educational institution's academic decisions are entitled to deference." *Zukle v. Regents of Univ. of*

16   *Cal.*, 166 F.3d 1041, 1047 (9th Cir. 1999); *see also Wong v. Regents of Univ. of Cal.*, 192 F.3d 807,

17   817 (9th Cir. 1999) ("We typically defer to the judgment of academics because courts generally are

18   ill-equipped, as compared with experienced educators, to determine whether a student meets a

19   university's reasonable standards for academic and professional achievement.") (internal quotation

20   marks omitted).  However, "[t]his deference is not absolute." *Wong*, 192 F.3d at 817.  "We must

21

22   [6] Plaintiff also argues that she be regarded as having a disability since Defendant has already
     provided her with modifications—a separate room and time-and-a-half—for test-taking.  "An
23   individual meets the requirement of 'being regarded as having such an impairment' if the individual
     establishes that he or she has been subjected to an action prohibited under this chapter because of an
24   actual or perceived physical or mental impairment whether or not the impairment limits or is
     perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A).  Because Plaintiff does not allege
25   that Defendant denied Plaintiff her requested accommodation *because of* her disability, Plaintiff
     cannot be deemed disabled under her alternative theory.  Moreover, to the extent Plaintiff argues that
26   Defendant should be precluded from denying that Plaintiff is disabled since Defendant has previously
     accommodated Plaintiff, that argument is rejected.  Such a rule would hamper an institution's
27   willingness to provide requested accommodations for fear that the institution would waive its ability
28   to challenge the issue of disability if a dispute was brought into court.

11

United States District Court
Northern District of California

1    ensure that educational institutions are not disguising truly discriminatory requirements as academic

2    decisions; to this end, the educational institution has a real obligation to seek suitable means of

3    reasonably accommodating a handicapped person and to submit a factual record indicating that it

4    conscientiously carried out this statutory obligation." *Id.* (internal quotation marks and alterations

5    omitted).  "Subsumed within this standard is the institution's duty to make itself aware of the nature

6    of the student's disability; to explore alternatives for accommodating the student; and to exercise

7    professional judgment in deciding whether the modifications under consideration would give the

8    student the opportunity to complete the program without fundamentally or substantially modifying

9    the school's standards." *Id.* at 818.  Only after the institution has met this obligation must a court

10   defer to the institution's academic decisions.  *Id.*

11        In *Wong*, the Ninth Circuit held on summary judgment that a medical school's dean's "denial

12   of Wong's requested accommodation is not entitled to deference because the University failed to

13   present us with a record undisputedly showing that Dean Lewis investigated the proposed

14   accommodation to determine whether the School of Medicine feasibly could implement it (or some

15   alternative modification) without substantially altering the school's standards." *Id.* at 818-19.  The

16   court found that the dean's denial of the plaintiff's requested accommodation—an eight-week

17   reading period before one of his clerkships—was improper because the dean "failed to discuss

18   Wong's proposal with any of the professionals who had worked with Wong to pinpoint his disability

19   and help him develop skills to cope with it." *Id.* at 819.  In addition, the court found that the dean's

20   rationale for denying the requested accommodation—that it was contrary to the purposes of the

21   curriculum—could be considered an after-the-fact justification for the University's actions.  *Id.*

22   ("Such after-the-fact justification obviously does not satisfy the University's obligation to present

23   'undisputed facts' showing that it conscientiously considered whether possible modification would

24   fundamentally or substantially alter the school's standards when it decided that it could not

25   reasonably accommodate the disabled student.").

26        Here, the Dean of the California School of Podiatric Medicine at SMU, John N. Venson,

27   states that a student should not be allowed to take Part I an unlimited number of times because,

28   based on his "past experience and research, additional testing opportunities do not produce more

United States District Court
Northern District of California

1    competent podiatrists." (Dkt. No. 12, Ex. 2, Declaration of Dean John N. Venson ¶ 9.) Dean

2    Venson goes on to note that the "three strikes" rule was passed "after deliberation and by unanimous

3    vote at a meeting of the CSPM Dean's Council." (*Id.* ¶ 10.) While the Court does not doubt that it

4    is an academic institution's prerogative to amend its policies to require its students to reach higher

5    academic standards, it is not apparent from the record before the Court how the "three strikes rule"

6    fits in with this heightening of standards. Dean Venson simply contends that "additional testing

7    opportunities do not produce *more* competent podiatrists." (*Id.* ¶ 9 (emphasis added).) The Court is

8    unable to discern the academic standard allegedly affected by additional testing opportunities. Read

9    literally, the statement suggests that SMU passed the "three strikes" rule because additional testing

10   would not result in *better* podiatrists; but the statement indicates nothing about whether providing

11   Plaintiff with additional testing opportunities will substantially or fundamentally alter SMU's

12   standards for the worse. In addition, nothing in the record shows that Defendant fulfilled the further

13   requirements necessary to receive the Court's deference. *See Wong*, 192 F.3d at 818  (finding that in

14   addition to considering whether the requested accommodation will fundamentally or substantially

15   alter the school's standards, "[it's] the institution's duty to make itself aware of the nature of the

16   student's disability [and] to explore alternatives for accommodating the student").

17        At the hearing on the Motion, Defendant argued that for the purposes of Plaintiff's

18   preliminary injunction motion, the burden should be on Plaintiff to produce evidence that Defendant

19   did *not* meet the requirements of *Wong* and *Zukle*. While it is Plaintiff's burden to produce evidence

20   satisfying each element of the preliminary injunction analysis, Defendant did not provide the Court

21   with any authority to support its position that it is Plaintiff's burden on this motion to present

22   evidence on the deference issue. Regardless of where the burden lies, the record before the Court

23   shows that there are, at a minimum, "serious questions" as to whether Defendant's decision to deny

24   Plaintiff's reasonable accommodation request is entitled to deference and, consequently, as to

25   whether providing "unlimited" testing opportunities for Part I is a reasonable accommodation.[7]

26   ────────────────
       [7] Defendant's argument that Plaintiff is not "otherwise qualified" does not overcome this
27   finding. Defendant's assertion that it "has done all that is necessary" to accommodate Plaintiff, and
     that Plaintiff can simply not keep up, assumes that Defendant's denial of Plaintiff's requested
28   accommodation was lawful. As already discussed, there are "serious questions" going to the merits
     on that issue.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 3.    Writ of administrative mandamus

Defendant also argues that this action is entirely precluded by Plaintiff's failure to exhaust her administrative remedies pursuant to California Code of Civil Procedure Section 1094.5.  The Court finds that Section 1094.5 is not applicable to this case.

"The doctrine of exhaustion of judicial remedies precludes an action that challenges the result of a quasi-judicial proceeding unless the plaintiff first challenges the decision though a petition for writ of mandamus." *Gupta v. Stanford Univ.*, 124 Cal. App. 4th 407, 411 (2004) (requiring plaintiff to file an administrative writ where "the gravamen of [the plaintiff's] claims [wa]s confined to the disciplinary process and the proceedings against him.").  Administrative mandamus is available for review of "any final administrative order or decision made as the result of a proceeding in which by law a hearing is required to be given, evidence required to be taken, and discretion in the determination of facts is vested in the inferior tribunal, corporation, board or officer." Cal. Code of Civ. P. § 1094.5(a).  "The inquiry in such a case shall extend to the questions whether the respondent has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion." *Id.* § 1094.5(b).

Defendant provides no case to the Court where Section 1094.5 has precluded a plaintiff's claims for failure to provide reasonable accommodations.  This is unsurprising considering that Section 1094.5 applies to a plaintiff who bases her claims on the results of a quasi-judicial proceeding.  In failure to accommodate cases, the liability arises upon the denial of reasonable accommodation in the first instance, not when a quasi-judicial body takes some action related to the failure to accommodate.  Here, even assuming Defendant's grievance procedures qualify as quasi-judicial under the statute, Plaintiff's claims are not based on the validity of those procedures or the results of the proceeding and therefore do not fall within the ambit of Section 1094.5. *See id.* § 1094.5(b).

## C.    Balance of Hardships

With the exception of Plaintiff's request to be allowed to take Part I pending the outcome of this litigation, the Court finds that the balance of hardships do not tip sharply in favor of Plaintiff.  Regarding Plaintiff's first requested injunction—return to active student status even before she

14

United States District Court

Northern District of California

1   passes Part I—the Court will not require Defendant to place one of its students in a clinical setting

2   with direct patient contact where Plaintiff has not passed the exam designed to ensure that she is

3   prepared for such a setting.  Dean Venson testifies regarding the third-year clinical rotations—

4   Medicine, Biomechanics, and Surgery—as follows:

5
6         All third-year clinical rotations require extensive patient contact and the provision of
    direct and invasive patient care. Students participate in hands-on care including, but not
7   limited to, taking patient x-rays, performing injections, utilizing sharp instruments to provide
    palliative care, obtaining vital patient information and serving as an assistant in surgical
8   procedures.

9         The Medicine rotation requires students to, *inter alia*, perform invasive procedures
10  including lumbar punctures, central line placements, tube insertions, and catheter placements.
    The rotation further requires that the student interpret a minimum of 50 test results including
11  laboratory findings, echocardiograms, and radiographs. The Surgery rotation requires
    students to, *inter alia*, assist in both podiatric surgeries and non-podiatric surgeries including
12  orthopedic, plastic, hand, vascular, and general surgery. The Biomechanics rotation requires
    students to assess and treat patients with lower extremity pathology that is mechanical in
13  origin including musculoskeletal evaluation of the foot and ankle, and treatment of
    mechanical pathologies using orthotic devices.
14

15        It is my informed medical and academic opinion that Ms. Doe is not qualified to
16  provide direct patient care in a clinical setting with respect to any of her remaining third-year
    rotations. Ms. Doe's inability to pass the Part I APMLE board exam indicates she has not
17  achieved the level of minimum competency, as measured by that examination, which is
    required of all students in order to be eligible for and prepared to enter third year clinical
18  rotations.

19

20  (Dkt. No. 12, Ex. 2, Venson Decl. ¶¶ 7-9.)  Plaintiff's response to this evidence is to simply claim

21  that her two years of study and an internship have adequately prepared her for the third-year

22  clinicals, and her attendance at the clinics without having passed Part I "would not harm SMU in any

23  way."  (Dkt. No. 11 at 11; *see* Dkt. No. 14 at 10-11 ("Surely, the harm that Plaintiff will suffer in

24  foregoing tuition, her ability to complete her degree, and the ability to find suitable work, outweighs

25  the miniscule amount of harm Defendant might possibly suffer to its reputation.").)

26        Even taking Plaintiff's assertions concerning her abilities as a podiatrist student as true, the

27  Court is cognizant of the substantial, though perhaps unlikely, risk to Defendant and the patients at

28  the third-party clinics posed by unqualified students.  Part I is designed as a gatekeeper to manage

15

United States District Court
Northern District of California

1  and reduce such a risk.  Plaintiff does not challenge the requirement itself; nor does she offer any

2  evidence that Defendant—or any podiatry school for that matter—has allowed a student to proceed

3  to third-year clinicals without having passed Part I.  At a minimum, Plaintiff has not shown that the

4  balance of hardships tip sharply in her favor, as she must under the "serious questions" test.

5      At the same time, however, the Court sees no hardship for Defendant if Plaintiff is allowed

6  inactive student status and is granted the ability to take Part I during the pendency of this litigation.

7  Such an injunction would allow Plaintiff to take the test while her knowledge of the subject matter

8  remains relatively fresh, and would involve only Defendant's minimal participation—namely,

9  granting Plaintiff inactive student status so she could sit for the exam.  Indeed, at the hearing on the

10  Motion, Defendant identified no hardship other than the alleged hardship in simply departing from

11  its "three strikes" rule.  The Court is not ruling, however, as to what is the consequence if Plaintiff

12  does, eventually, pass the test; that is the ultimate question to be determined in this lawsuit.  Thus, it

13  may very well be that at the end of the day the ruling will be that Defendant did not violate the ADA

14  by enforcing its three strikes rule against Plaintiff.  If so, Defendant has not been harmed by

15  allowing her to take the test in the interim.  If, on the other hand, the ultimate determination is that

16  Plaintiff should be granted unlimited, or at least more, opportunities to take the test, Plaintiff will

17  have been irreparably harmed during the intervening years as it will be that much longer—and

18  difficult—before she passes the test, if ever.  Thus, with respect to Plaintiff's request that she merely

19  be allowed to take the test, the balance of hardships tips sharply in Plaintiff's favor.

20      The Court notes that this preliminary relief would be unnecessary if Plaintiff could take Part I

21  without being enrolled as a student.  Accordingly, at oral argument the Court asked the parties

22  whether in fact Plaintiff must be enrolled in a podiatry school to take the exam since she has

23  completed all of the prerequisite course requirements.  The parties were of the belief that the Part I

24  administrator requires such enrollment.  Following oral argument, Defendant filed a letter asking for

25  additional time to supplement the record with a response to the Court's question.  Defendant's

26  request is denied.  Defendant can move to vacate the preliminary injunction if it determines that

27  Plaintiff does not need to be enrolled to obtain the injunctive relief she seeks; namely, to take the

28  Part I exam.  Through such a process Plaintiff will have a full and fair opportunity to respond.

United States District Court
Northern District of California

**D.      Public Interest**

Considering that the Court has already found that there are "serious questions" going to the merits, it follows that that there is considerable public interest weighing in favor of Plaintiff since "the public clearly has an interest in the enforcement of its statutes."  *Enyart*, 2010 WL 475361 *8, *aff'd*, 630 F.3d at 1167 ("The district court did not abuse its discretion in concluding that the issuance of these preliminary injunctions served the public's interest in enforcement of the ADA and in elimination of discrimination on the basis of disability.").  However, consistent with the discussion above concerning the balance of hardships, the Court finds that the public interest does not weigh in Plaintiff's favor to the extent she requests an injunction that goes beyond simply being permitted to sit for the Part I exam during the pendency of this litigation.

<b>CONCLUSION</b>

For the reasons stated, the Motion is GRANTED in part and DENIED in part.  The parties shall meet and confer and propose language of a preliminary injunction consistent with this Order. Such language shall be proposed, at the latest, in the parties' joint Case Management Conference Statement.

IT IS SO ORDERED.

Dated: February 1, 2013

_____
JACQUELINE SCOTT CORLEY
UNITED STATES MAGISTRATE JUDGE

17